Filed 11/26/25  In re M.C. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Lassen)

----

| | |
|---|---|
| In re M.C., a Person Coming Under the Juvenile Court Law. | |
| LASSEN COUNTY HEALTH AND SOCIAL SERVICES AGENCY,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>H.D.,<br><br>Defendant and Appellant. | C103400<br><br>(Super. Ct. No. 2024-JV0073796) |

Appellant H.D., mother of the 10-year-old minor M.C., challenges the juvenile court's dispositional order bypassing her for reunification services under Welfare and Institutions Code section 361.5, subdivision (b)(10) and (b)(11).[1]  Because we agree with mother that the record does not support bypassing her for services, we will reverse the bypass order, direct that mother be provided with reunification services, and remand the

_____

[1] Further undesignated statutory references are to the Welfare and Institutions Code.

1

matter for further dispositional proceedings, including preparation of an appropriate case plan.

BACKGROUND

Given the limited issues on appeal, we provide only a short summary of the relevant facts.

In September 2024, the Lassen County Child and Family Services Department (Department) filed a dependency petition under section 300, subdivisions (b)(1), (g) and (j) on behalf of minor M.C. Under subdivision (b)(1) (failure to protect), the petition alleged that both parents were drug abusers and mother had left the then-nine-year-old minor alone while going out at night to steal copper.[2] The petition noted the minor's half siblings had "received permanent placement services in part due to mother's illicit drug abuse." Mother and the minor were also alleged to be "squatting" (living without permission) in a trailer. Under subdivision (g) (failure to provide support), the petition alleged that mother left the minor with the Department without a viable plan for care and supervision, and that mother led "a transient life style" and father was incarcerated. Under section 300, subdivision (j) (sibling abuse), the petition alleged the minor's three half siblings were former dependents of the juvenile court who received permanent placement services "in part due to [mother's] illicit substance abuse and untreated mental health issues."

According to the detention report, mother and the minor had been staying at a trailer in a remote part of Lassen County when mother was arrested on outstanding warrants and the Department took temporary custody of the minor. Two days later, the social worker interviewed mother at the jail following her arrest and mother told the social worker that she believed she had permission (from a friend) to live in the trailer and had been living there for three months. The social worker told mother to come to the

---

[2] The minor later reported that mother stole mostly food and ice and used the money from the stolen copper to buy food.

2

Department the next morning after she was released from custody; mother left a message she would come to see the social worker at noon. Mother arrived three hours late and her speech was more rapid than on the previous day.[3] Concerned she was under the influence, the social worker asked mother to provide a urine sample for drug testing; mother declined.

The juvenile court detained the minor. At the Department's request, the court ordered drug testing immediately after the detention hearing concluded. Mother was unable to produce a urine sample, but she provided a saliva sample that tested positive for methamphetamine. The day following the detention hearing, the social worker contacted the owner of the property where mother was staying and learned the owner was out of state and her house sitter had given mother permission to stay on the property.

In the jurisdiction report, the Department represented that mother had tested positive for methamphetamine just prior to the birth of a child in 2010 and at the birth of a second child in 2011. The Shasta County child welfare agency received a report after the birth of a third child, citing concerns about mother's mental health and her lack of prenatal care. The report noted mother had methamphetamine abuse problems and chronic mutual domestic violence issues, which resulted in all three minors' detention. Mother was assessed for drug services but failed to begin those services. The report said that the three children were declared dependents in December 2012, reunification services were terminated as to mother in January 2014, and mother's parental rights were terminated in October 2014.

The jurisdiction report also detailed mother's criminal history. In 2010, she was convicted of misdemeanor possession of a controlled substance and drug paraphernalia. Between 2009 and 2012, she had 12 warrants, primarily for theft offenses, failures to

---

[3] We note that mother's three-hour delay in meeting with the social worker appears to have been the basis for the petition's accusation that mother had left the minor with the Department "without making a viable plan for the child's ongoing care and supervision."

3

appear, and probation violations. She was arrested in 2010 for domestic violence and fighting in public, and in 2011 for robbery and conspiracy. In 2012, she was convicted of grand theft. Between 2012 and 2024, she had no criminal arrests or convictions; in 2024, one warrant was issued and her arrest and subsequent detention of the minor occurred, as we have described *ante*.

During mother's first supervised visit with the minor, the social worker paused the visit after she observed mother engaging the minor in inappropriate conversations. At the conclusion of the visit, mother refused to provide a urine sample for drug testing at that time, indicating she wanted to talk to her attorney first.[4]

The social worker testified during an interim hearing that when mother left the courtroom, mother looked at the social worker and said she was coming for her. Mother's counsel informed the juvenile court that mother was upset about some of the things that had been said and mother indicated she would be filing a grievance against the social worker.

At another interim hearing, the social worker reported visitation had not been going well and mother had repeatedly made inappropriate statements to the minor. The social worker had terminated the most recent visit and mother threatened to call the FBI. Mother also had refused to (voluntarily) test. The juvenile court temporarily suspended visitation until the next hearing.

Mother submitted a statement asserting the jurisdiction report was based on outdated information; she was not "squatting" in the trailer they were living in; the social worker's report contained contradictions, and she was neither a current nor a frequent user of drugs. Mother stated she had housing and did not understand why her visitation had been suspended. She added there was no reason for the minor to have been detained

---

[4] The record does not reflect that mother had yet been ordered to drug test by the juvenile court beyond the single test, at the Department's request, which we have described *ante*.

4

in the first place.  Under oath, she gave the court her new address.  She asserted she did not leave her child alone while she stole copper.

After mother's testimony, the juvenile court found the allegations of the petition (including allegations that mother had been squatting in the trailer and "currently" had no shelter for the minor, which the record reflects were not proven) true by a preponderance of the evidence and set the matter for a dispositional hearing.

In the disposition report, the Department's initial recommendation was that both parents be bypassed for reunification services.  (§ 361.5, subd. (b)(10) & (11).)  The report opined that mother's long history of methamphetamine abuse continued, as did her history of behavioral health concerns, which prevented her from regulating her emotions and behaving in a way that supported the minor's well-being.  The report noted the minor's half siblings were removed from mother due to her methamphetamine abuse problem, chronic mutual domestic violence, and untreated mental health issues.  She did not successfully reunify with them, and her parental rights were terminated as to those children in 2014 (one child) and 2018 (two children), respectively.  The report asserted mother's substance abuse and mental health issues continued to impede her ability to parent the minor, and the Department had determined that reunification with mother would not be in the minor's best interest due in part to mother's continuing display that she was unstable and reactive and because mother had provided no evidence of "any efforts to ameliorate the issues preventing her from safe[l]y parenting her child."

Mother filed a brief opposing the Department's recommendation to bypass the parents for services.  She argued the Department's evidence she "had not made reasonable efforts" was insufficient, pointing out that the Department had produced no evidence of what problems led to the removal of mother's older children "beyond a general statement . . . that she abused substances and had mental health issues," nor had the Department produced any evidence to connect the issues in the instant case, i.e., leaving the minor alone in a trailer, with the issues in the prior case.

5

At the next hearing, the social worker reported the Department was prepared to offer reunification services to father because his criminal offenses in Texas did not qualify for bypass in California.  Minor's counsel disagreed with the Department's recommendation to bypass mother, asserting the minor's best interests had not been thoroughly assessed and mother had taken care of the minor for her entire life.

Mother presented the testimony of a friend of 10 years.  The friend claimed she had never seen mother under the influence of drugs.  Mother had admitted to drug issues in the past, but the friend believed those issues remained in the past.  The friend also testified she was aware mother had depression and dealt with PTSD at times, and mother would come talk to the friend if she needed help.  The friend testified mother was an amazing parent who always did extra things for the minor.  On cross-examination, the friend qualified that she had not seen mother that much for the past few years.

Mother testified on her own behalf.  She said the issues that led to the detention of her older children were "Drug use.  Mainly no prenatal care.  And with my other two daughters, it was being homeless for like three years."  She testified one child tested positive for drugs at birth, but the other two did not.  Mother asserted she had taken a 52-week anger management course and graduated from two parenting classes.  She saw a therapist for almost two years and attended nine months of Shasta County's perinatal drug program.  She also received prenatal care for the minor and met with a social worker once a week throughout her pregnancy.

Mother testified that these programs helped her to get off the streets and start taking her "meds," and to learn routine and structure.  She claimed the last time she was homeless was before she moved to Lassen County in 2013.  She asserted she was now living with the friend who had testified.  The last time she used drugs was about a year before she became pregnant with the minor.  Since then, she had only smoked marijuana from time to time.

6

Mother testified she felt bullied by the Lassen County social workers and that their minds were made up.  As a result, it was difficult to communicate with them.  She denied being aggressive and said she had merely stood up for herself and her daughter.  She admitted she was loud and that the entire situation was upsetting.  She asserted the social worker was belittling and demeaning, and, as a result, she could not have a civil conversation with her.

Although mother testified that she did not have a "sober date," she said she stayed sober.  She said that after her positive drug test, she took a test of her own and it came back negative.  She denied refusing to test on the day after she was released from custody.  She was not currently working because of her mental health issues  and was not currently seeing a therapist or taking any medication, but remained open to receiving a mental health assessment.

The minor's counsel argued it was in the 10-year-old minor's best interest for mother to receive services as the minor had been in mother's care her entire life.  Counsel agreed mother was difficult to deal with given her mental health issues and she would benefit from a psychological evaluation.

At the conclusion of the disposition hearing, the juvenile court ruled as follows: "The genesis of this case is the Department intervened when the child was left alone . . . [in] a relatively remote part of Lassen County, when the mother was out stealing copper.  And it's noteworthy that during the so-called, you know, six-month period where she [was] supposed to be amenable to services, she's in Shasta County.  I mean, that's a start. . . .  [¶]  First thing she did -- and I don't know if that's on the record in terms of under oath testimony -- but she -- first thing she did at detention was threaten bodily harm to the social worker.  Now, she has a new social worker, a man who presumably [is] better able to withstand any possible threats to his personal safety.  Looking at the evidence in this case and the testimony of [mother], it's just clear to me that she lacks insight into her own circumstances and her relationship to the world at large and to her daughter.  [¶]  I, I

7

concur with [the Department] that under [section] 361.5(b)(10) and (11), once they show a legitimate and valid bypass, which they did arising out of Shasta County, it's in the record, the burden shifts to your client to show that she's ready, willing and able to take advantage of services, and she can take the necessary steps to ameliorate the conditions that lead to removal. She has been and currently is a person who abuses methamphetamine, and maybe other things, I don't know, but that's enough. [¶] Because of that, she has an extreme antisocial attitude. She's extremely aggressive, and she's more focused on herself than doing what she needs to do to protect and raise her daughter. She just has been missing in action for this whole time period since detention. The record is replete with efforts of the social workers to try to get ahold of her. She never answers her phone or doesn't have a phone or is out of the county or has disappeared or is in jail or – she's just not focusing on services because she views everybody as the enemy, adverse to her personal interest, and she views this whole operation of the court taking jurisdiction as an invasion of her rights in her private world. [¶] . . . I don't see how is it in the best interest of a ten-year-old child to be raised by a mother who values methamphetamine, who is defiant, who is socially aggressive and not really interested in the daughter, not interested in her best interest? She just, like I said, lacks insight. She won't test. She won't . . . stick around to get services. [¶] . . . I know it's difficult for the social workers to work with her. That's not a reason, but I think once there's a bypass situation, the burden does shift to her to show that she wants to do this, and she hasn't demonstrated that. She won't test, and when she does manage, we do manage to get a test, it's a positive test. And I just have to ask, is it really in the best interest of the child to have a mother [who] is basically raising her to, raising her to defy any kind of authority, any kind of rational, a request for rational behavior? [¶] She's got, you know, no housing. She doesn't follow up on it. And I have to ask, why is she in Redding when she's supposed to be getting services? So, I think, on balance, . . . I just don't see this, that she has sustained the burden of persuading the Court that there's even

8

a reasonable likelihood that she will make a significant change in her behavior, which is necessary to alleviate the problems that lead to detention. So I'm going to deny . . . additional services for her, for the mother."

Mother filed a timely notice of appeal.

DISCUSSION

Mother argues the juvenile court erred in denying reunification services because the finding that she had not made reasonable efforts to ameliorate the conditions that led to the termination of her parental rights to the half siblings in 2014 and 2018 was unsupported by the evidence. She further contends the court impermissibly shifted the burden of proof to her to demonstrate that she *made* reasonable efforts to treat the problems leading to removal rather than requiring the Department to demonstrate she *did not make* reasonable efforts. Finally, she asserts the best interest of the minor supports the provision of services to mother. We agree that the evidence of no reasonable efforts in the record before us is insufficient to sustain a bypass finding on those grounds, as we next explain.

Generally, a juvenile court is required to provide reunification services to a child and the child's parents when a child is removed from parental custody. (§ 361.5, subd. (a).) The purpose of providing reunification services is to "eliminate the conditions leading to loss of custody and facilitate reunification of parent and child. This furthers the goal of preservation of family, whenever possible." (*In re Baby Boy H.* (1998) 63 Cal.App.4th 470, 478.) "[S]ection 361.5, subdivision (b), exempts from reunification services ' "those parents who are unlikely to benefit" ' from such services or for whom reunification efforts are likely to be 'fruitless.' " (*Jennifer S. v. Superior Court* (2017) 15 Cal.App.5th 1113, 1120.) When the juvenile court concludes reunification efforts should not be provided, it goes directly to permanency planning so that permanent out-of-home placement may be arranged for the dependent minor. (*Id.* at p. 1121.) The statutory sections authorizing denial of reunification services are commonly referred to as

9

bypass provisions. (*Ibid.*) "When the court determines a bypass provision applies, the general rule favoring reunification is replaced with a legislative presumption that reunification services would be ' "an unwise use of governmental resources." ' " (*In re Allison J.* (2010) 190 Cal.App.4th 1106, 1112.)

As relevant here, section 361.5, subdivision (b)(10)(A), provides that a juvenile court may deny services if there is clear and convincing evidence: "That the court ordered termination of reunification services for any siblings or half siblings of the child because the parent . . . failed to reunify with the sibling or half sibling after the sibling or half sibling had been removed from that parent . . . and that, according to the findings of the court, this parent . . . has not subsequently made a reasonable effort to treat the problems that led to removal of the sibling or half sibling of that child from that parent."

Similarly, subdivision (b)(11)(A) of section 361.5, provides that a juvenile court may deny services if there is clear and convincing evidence: "That the parental rights of a parent over any sibling or half sibling of the child had been permanently severed, and this parent is the same parent . . . and that, according to the findings of the court, this parent has not subsequently made a reasonable effort to treat the problems that led to removal of the sibling or half sibling of that child from that parent."

When read as a whole, section 361.5 erects a two-step, burden-shifting procedure for bypassing reunification services under subdivisions (b)(10) and (b)(11). (*In re Jayden M.* (2023) 93 Cal.App.5th 1261, 1272.) In the first step, the Department bears the burden of proving three things by clear and convincing evidence. (*Ibid.*) First, that the juvenile court ordered termination of reunification services under section 361.5, subdivision (b)(10)) or had severed parental rights under section 361.5, subdivision (b)(11)) in a prior case involving a sibling or half sibling of the child in the current case. (*Jayden M.*, at p. 1272.) Second, the problem that led to the removal of the sibling or half sibling is the same problem at issue in the current case, insofar as the problem involves the same theme even if it is not identical. (*Ibid.*) Third, the parent has " 'not subsequently made a

10

reasonable effort to treat th[at] problem[].' " (*Ibid.*) Next, in the second step, "which presupposes the Department has carried its initial burden, the burden shifts to the parent to prove that it is in the child's best interest for the juvenile court to exercise its discretion to provide reunification services in this case." (*Ibid.*)

We review the juvenile court's order denying reunification services under section 361.5, subdivision (b) for substantial evidence. (*R.T. v. Superior Court* (2012) 202 Cal.App.4th 908, 913-914 & fn. 3; *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 995-996.)

We begin with the observation that here the "issues" with mother's parenting that overlap both the previous and current dependency cases are limited to mother's alleged substance abuse and unspecified mental health issues that "continue to impede her ability to parent" in a safe and healthy manner. (See *In re Lana S.* (2012) 207 Cal.App.4th 94, 108 [juvenile court may apply § 361.5, subd. (b)(10) bypass provisions where parent's failure to reunify with the child's siblings was based, at least in part, on issues raised in the current case].) Yet there is *no* evidence in the record regarding the nature of mother's earlier unspecified mental health issues or how they affected her ability to parent the half siblings, which is necessary to assess mother's efforts at addressing this problem. As evidence of lack of reasonable efforts as to mental health issues, the Department cited not to behavior that occurred between 2014 or 2018 and the initiation of the present case, but instead only to mother's "unstable and reactive" interactions with the Department after this minor's detention. This is not clear and convincing evidence of lack of reasonable efforts by any measure.[5]

---

[5] Importantly, although the Department asserted the instant matter and the 2010 case involving minor's half siblings presented many of the same circumstances in that mother's substance abuse "and mental health issues continue to impede her ability to parent . . .", the current petition does not assert mental health issues as a basis for jurisdiction. The sole bases asserted for removal of the minor in *this* case were mother's "transient lifestyle" and substance abuse. Thus, mother's mental health cannot form the

11

When analyzing whether to bypass services for a parent, the juvenile court should consider the entire time span from between the time of the earlier removal up to and including the dispositional hearing in the current case. (*In re Jayden M., supra*, 93 Cal.App.5th at p. 1274.) "A 'reasonable effort to treat' a problem means just that. The question is not whether the parent has ' " 'cure[d]' " ' or ' "abolished" ' the problem [citations], or whether the parent has 'attained' a ' "certain level of progress" ' [citation]. Instead, the focus is on the parent's *effort*. It is not enough to show 'any' effort, even a genuine one. [Citation.] '[L]ackadaisical or half-hearted efforts' will also not do. [Citation.] Instead, the effort must be *reasonable*, and reasonableness is assessed by looking to (1) the duration of the parent's effort, (2) the 'extent and context' of the parent's effort, and (3) other factors related to the 'quality and quantity of those efforts.' [Citation.] The parent's progress, or lack thereof, 'both in the short and long term'-- while not dispositive--is nevertheless relevant 'to the extent it bears on the reasonableness of the effort made.' " (*Id.* at p. 1276, fn. omitted.)

Here, mother does not dispute that the juvenile court terminated her parental rights over the minor's half siblings or that those cases involved allegations of substance abuse. The challenge is to the court's determination that the Department had proved, by clear and convincing evidence, that mother did not make "reasonable efforts" to ameliorate this condition. This challenge is well-taken. Even assuming for the sake of argument that the juvenile court did not engage in burden shifting, the record contains insufficient evidence to support any finding that the Department presented clear and convincing evidence of mother's lack of reasonable efforts to address her substance abuse.

The record shows the court was concerned with what it perceived to be mother's failure to show that she would change her behavior going forward in the manner the court felt was appropriate. There is no indication whatsoever that the court required the

basis for bypass under section 361.5, subdivision (b)(10) or (b)(11), even had the Department presented evidence that mother failed to make reasonable efforts at treating her mental health issues, which it did not.

Department to show by clear and convincing evidence that between 2010 and 2024 mother made no reasonable efforts to address her substance abuse, which was the Department's burden to show. The Department's evidence consisted of one incident of perceived drug use (based on mother's rapid speech pattern) just prior to detention, one (postdetention) positive test, and ongoing refusals to voluntarily test, all in 2024 and 2025. No evidence addressed the remainder of the substantial time period at issue here, except mother's evidence of sobriety, services, and efforts in that regard. There is no indication that the court looked to the Department to discuss duration, extent and context, and other factors indicating quantity and quality of efforts. Instead, as we have set forth *ante*, the court commented on mother's poor attitude and perceived ongoing methamphetamine abuse, but not on matters relevant to the legal considerations that needed to be made in this situation, where a 10-year-old child who has lived with her mother her entire life (as minor's counsel noted) is given no chance at reunification because her mother is denied services.[6]

Indeed, the only evidence the record contains on the subject is that mother had made at least some efforts to alleviate the issues that caused the detention and ultimate loss of her first three children between 2010 to 2018. Mother testified she went to therapy for two years, graduated from two parenting classes, and took a 52-week anger management course. Unlike with her older children, she obtained prenatal care while pregnant with the minor in the instant case, attended nine months of a perinatal drug program, and had met with the social worker every week during her pregnancy. There

---

[6] We note that substance abuse alone, without proof of an inability to provide care such that there is a substantial risk of harm to the child, is not a sufficient basis for jurisdiction even if it causes other "negative manifestations." (*In re N.R.* (2023) 15 Cal.5th 520, 540.) Although the analysis here is slightly different, as we have set forth, the "extreme antisocial attitude" the juvenile court opined had been caused by mother's methamphetamine use appears to be one such negative manifestation and not proof of an inability to provide care. Further, the court's observation regarding drug use as the cause of mother's "attitude" is completely unsupported by any evidence in the record before us.

was no evidence contradicting these assertions. Nor was there any evidence of substance abuse during this substantial time frame.

Mother asserted her efforts helped her get "off the streets" and to start taking her medications. She claimed that she had last been homeless in 2013 and was not currently homeless. There was no evidence to the contrary. Although there was some very limited evidence that mother had recently used or was currently using methamphetamine, as we have described, the record reflects *no* documented or even suggested substance abuse or even any criminal activity, much less drug-related criminal activity, at all between 2012 and 2024, which encompassed the relevant time period at issue--the time during and since the half siblings' detention and mother's loss of parental rights. This is a marked improvement from mother's earlier record.

The minor was born in 2015 and lived with mother for the first nine years of her life. The Department points to nothing in the record that suggests substance abuse, arrests, warrants, or even mental health issues during that time period, with the only exception being the happenings surrounding the 2024 detention of the minor in the current case. There is nothing in the record suggesting the Department or any entity committed to child welfare felt the need to intervene in the minor and her parents' family life during the minor's lifetime. This stands in contrast to 2010, when intervention was necessary and ultimately cost mother her parental rights as to three of her children.

Simply put, the bypass order is not supported by substantial evidence. Because that order cannot stand, we need not decide mother's claim regarding the best interest of the minor under Section 361.5, subdivision (c), and thus address the subject only briefly, as it was discussed at length by the juvenile court and the parties below and may well be at issue in future hearings in this case.

Prior to her removal, minor had been with mother since birth with no alleged or apparent interaction with the juvenile dependency system. She was discovered to be alone because mother was arrested on warrants, not because an emergency event had

14

occurred.  The inflicted emotional trauma alleged here is leaving a nine-year-old girl alone (with a cell phone) at a trailer that was then serving, with at least some permission apparent in the record, as her home.  Father was given services; thus, the provision of services to mother would not have added significantly to a delay in permanency.  Minor's counsel opined that the minor's best interest was for mother to receive services, which we note is the only apparent path to reunification still open to mother and her daughter in this case.

We thus will reverse the bypass order, direct that mother be provided with reunification services, and remand the matter for further dispositional proceedings, including preparation of an appropriate case plan.

### DISPOSITION

The dispositional orders of the juvenile court that decline to provide appellant with reunification services are reversed and the case is remanded with directions to order reunification services for appellant and conduct further dispositional proceedings as necessary, including preparation of an appropriate case plan.

/s/
Duarte, J.

We concur:


/s/
Earl, P. J.



/s/
Mauro, J.

15